IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BUDD FRANKENFIELD, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO. 18-3069 |
| | : | |
| SALISBURY TOWNSHIP, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Perkin, Henry S., M.J.                                                                         July 2, 2020

Plaintiff, Budd Frankenfield, filed this civil action against Defendant Salisbury Township for alleged violations of the Uniform Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. § 4301, *et seq.* This matter proceeded to trial on November 19, 2019. After two days of trial, the jury returned a verdict in favor of Salisbury Township. Presently before the Court is Mr. Frankenfield's Motion for New Trial. Upon consideration of the Motion and Salisbury Township's Response in Opposition thereto, the Motion will be denied.

I.      **BACKGROUND.**

Mr. Frankenfield, a patrolman who is employed by the Salisbury Township Police Department, contends that Salisbury Township violated USERRA when it revoked his probationary appointment to the Corporal position because of his ongoing military service obligations in the United States Army Reserve. At the conclusion of the trial, the jury found that Mr. Frankenfield had proven that his obligation for service in the military was a motivating factor in Salisbury Township's decision not to retain him in the Corporal position following his probationary period in that capacity. Jury

Interrogatories/Verdict Sheet, Nov. 21, 2019, ECF No. 26.  The jury then found that Salisbury Township had proven by a preponderance of the evidence that it would have denied Mr. Frankenfield the Corporal position even if Salisbury Township had not taken into account Mr. Frankenfield's military service obligation.  *Id.*  Mr.  Frankenfield moves for a new trial because he contends that: (1) the jury verdict was inconsistent and evidence of the jury's confusion over the law; and (2) the Court improperly allowed into the case excessive hearsay evidence by Sergeant Sabo of Mr. Frankenfield's conduct as a Corporal.

**II.     STANDARD**.

The ordering of a new trial is a matter committed to the sound discretion of the district court. *Bonjorno v. Kaiser Alum. & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984), *cert. denied*, 477 U.S. 908 (1986); Fed. R. Civ. P. 59. The grant of a new trial may be justified where, for example, material evidence has been improperly excluded or a material issue has been improperly submitted to the jury. *See Petree v. Victor Fluid Power, Inc.*, 887 F.2d 34, 41 (3d Cir. 1989); 6A James M. Moore, et al., *Moore's Federal Practice*, ¶ 59.08.

When evaluating a motion for a new trial on the basis of trial error, the Court must first determine whether an error was made in the course of trial, and then must determine "whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'" *Farra v. Stanley-Bostitch, Inc.*, 838 F. Supp. 1021, 1026 (E.D. Pa. 1993) (citations omitted). "Absent a showing of 'substantial' injustice or 'prejudicial' error, a new trial is not warranted and it is the court's duty to respect a plausible jury verdict." *Goodwin v. Seven-Up Bottling Co. of Phila.*, CIV.A. No.

96-CV-2301, 1998 WL 438488, at *3 (E.D. Pa. July 31, 1998) (citing *Videon Chevrolet, Inc., v. Gen. Motors Corp.*, Civ. No. 91-4202, 1994 WL 188931, at *2 (E.D. Pa. May 16, 1994), *aff'd*, 46 F.3d 1120 (3d Cir. 1994)).

### III.   DISCUSSION.

#### A.   Whether the Jury Verdict Was Inconsistent.

Mr. Frankenfield contends that the verdict was inconsistent because the jury found that his return to military service was a motivating factor in the decision to revoke his probationary appointment to a Corporal position and Salisbury Township demonstrated that the adverse job action would have occurred even without considering Plaintiff's military service.  Plaintiff contends that this verdict was inconsistent and the jury was confused as to the law. Plaintiff cites the following language in the jury instructions:

> Salisbury Township claims that Mr. Frankenfield's application for and membership in a uniformed service was not a motivating factor in its decision and that it did not promote Mr. Frankenfield for other reasons. An employer may not discriminate against an employee because of the employee's membership or application for membership in a uniformed service.  But an employer may decline to promote an employee for any other reason, good or bad, fair or unfair.  If you believe Salisbury Township's reasons for its decision not to promote Mr Frankenfield and find that its decision was not motivated by Mr. Frankenfield's membership or application for membership in a uniformed service, you must not second guess Salisbury Township's decision, and you must not substitute your own judgment for Salisbury Township's judgment – even if you disagree with it.
>
> . . . .
>
> To decide whether Mr. Frankenfield's membership or application for membership in a uniformed service was a motivating factor in Salisbury Township's decision not to promote Mr. Frankenfield, you may consider the circumstances of Salisbury Township's decision.  For example, you may consider whether you believe the reasons that Salisbury Township gave for the decision.  If you do not believe the reasons that it

>gave for the decision, you may consider whether the reasons were so
>unbelievable that they were a cover-up to hide the true discriminatory
>reasons for the decision.

N.T., 11/21/19, pp. 123-24.  Mr. Frankenfield argues that before the jury answered yes to jury interrogatory Number 1, "Do you find that Plaintiff Bud Frankenfield, has proven by a preponderance of the evidence that his obligation for service in the military was a motivating factor in Defendant Salisbury Township's decision not to promote him to the Corporal position?"  Dkt. No. 26, p. 1, the jury must have considered and rejected Salisbury Township's stated reasons for reducing him in rank, which would make the jury's affirmative determination in Question 2, "Do you find that Defendant Salisbury Township has proven by a preponderance of the evidence that it would have denied Mr. Frankenfield the promotion to Corporal even if Salisbury Township had not taken Mr. Frankenfield's obligation for service in the military into account" inconsistent.

Mr. Frankenfield points only to a portion of the language in the jury instructions.  Following the above cited instructions, the Court also instructed the jury:

>If you find in Mr. Frankenfield's favor for each element that he
>must prove, you must decide whether Salisbury Township has shown by a
>preponderance of the evidence that it would have denied Mr. Frankenfield
>a promotion even if Salisbury Township had not taken Mr. Frankenfield's
>membership or application for membership in a uniformed service into
>account.  If you find that Mr. Frankenfield would not have been promoted
>for a reason or reasons other than his membership or application for
>membership in a uniformed service, you must make that finding in your
>verdict.
>   If you find for Mr. Frankenfield and against Salisbury Township
>on this defense, you must consider Mr. Frankenfield's compensatory
>damages.

*Id.* at 124.  This USERRA jury instruction is the Standard Civil Jury Instruction from the United States Court of Appeals for the Eleventh Circuit, which reflects

4

the two-step burden-shifting framework for analyzing USERRA claims in the United States Court of Appeals for the Third Circuit. In *Murphy v. Radnor Township*, 542 F. App'x 173 (3d Cir. 2013), the Court advised that:

> USERRA, by its own terms, establishes a two-step burden-shifting framework by which to analyze such claims. First, the plaintiff alleging the discriminatory act bears the initial burden of showing that the "employee's military service was a substantial or motivating factor in the adverse employment action." *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed.Cir. 2001) (internal quotation marks omitted).
>
> A motivating factor does not mean that it had to be the sole cause of the employment action. Instead, it is one of the factors that a truthful employer would list if asked for the reasons for its decision. Indeed, [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005) (alteration in original) (internal quotation marks and citations omitted).
>
> If the plaintiff meets his burden, the burden of proof then shifts to the employer, who must prove that it would have taken the adverse action for non-discriminatory reasons, regardless of the employee's military service. *Sheehan*, 240 F.3d at 1013. This standard of proof is the "but for" test. *Coffman*, 411 F.3d at 1238. "All that is meant [by this standard] is that if the [employer] had two reasons for taking an adverse action against the [employee], one of them forbidden by the statute and the other not, and the [employer] can show that even if the forbidden one had been absent the adverse action would still have been taken, the [employee] loses." *Madden v. Rolls Royce Corp.*, 563 F.3d 636, 638 (7th Cir. 2009).

*Id.* at 176-77 (footnotes omitted). The USERRA instruction given to the jury mirrored the Third Circuit's framework. Thus, it was proper.

Plaintiff also argues that the Court essentially eliminated Plaintiff's argument that the stated reasons offered by Salisbury Township were pre-textual by

> instructing the jury that they could not "second guess" the township's stated reasons for firing the Plaintiff. The jury was essentially told that they could not reject those reasons if they found them to be a poor reason to deny someone a promotion. Such a belief would cause the jury to reject

> that reason as a pre-text for purposes of answering Question 1. That same
> juror could then feel bound to accept that reason for purposes of Question
> 2 after being told that they could not second-guess the stated reasons.

Pl.'s Br., pp. 3-4. A careful reading of the instructions shows that the Court instructed the jury that they could not second guess Salisbury Township's *decision* to deny Mr. Frankenfield the Corporal position if the jury believed the reasons provided by Salisbury Township and the decision not to promote was not motivated by Mr. Frankenfield's membership or application for membership in a uniformed service. The jury was free to accept or reject the reasons provided by Salisbury Township for its decision.

Fed.R.Civ.P. 51 provides that a party may not assign as error defects in jury instructions unless the party distinctly stated its objection before the jury retired to consider its verdict. *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542, 549 (3d Cir. 1999) (citing Fed. R. Civ. P. 51 and *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 277 (3d Cir.1998) ( "[T]o preserve an issue for appeal, counsel must state distinctly the matter objected to and the grounds of the objection.")). Mr. Frankenfield's counsel made no objection to the jury instructions before the jury retired to consider its verdict. Mr. Frankenfield's counsel also agreed to the form of the Verdict Sheet and had no objection to the Verdict Sheet prior to the submission of the jury instructions and Verdict Sheet to the jury nor when the jury returned with their verdict. Therefore, any objection to the Verdict Sheet is now foreclosed. *See Jacobs v. City of Phila.*, No. 03-CV-950, 2005 WL 1899499, at *11 (E.D. Pa. Aug. 8, 2005) (citations omitted) **(Baylson, J.).** The jury verdict was not internally inconsistent and there was no error in the Court's USERRA instruction, which followed Circuit case law. The Verdict Sheet was also

consistent with the USERRA instruction and Circuit case law.  Thus, this claim provides no support for Plaintiff's Motion for a new trial.

>    B.    **Whether the Court Permitted the Admission of Improper and Prejudicial Hearsay Evidence.**

Mr. Frankenfield contends that he should be granted a new trial on the basis that this Court permitted the introduction of improper, prejudicial hearsay evidence through the testimony of Sergeant Christopher Sabo.  Sergeant Sabo is the "sergeant of Investigations and Special Services, which is criminal investigations, crime scene, school resource officers, basically anything but patrol."  N.T., 11/20/19, p. 168.  According to Mr. Frankenfield, Sergeant Sabo's testimony regarding multiple incidents cast him in a negative light despite the fact that the Sergeant had little or no direct involvement in those incidents and he testified to multiple facts using the hearsay statements of others.

Mr. Frankenfield specifically notes that Sergeant Sabo testified about an investigation of a gang "jump out" despite Sabo's absence for the investigation and only Mr. Frankenfield's direct supervisor, Sergeant Soberick, testified that the gang "jump out" was a reason for Mr. Frankenfield's failure to complete probation.  The trial transcript shows the following direct questioning of Sergeant Sabo by defense counsel:

> Q:    All right. Now, there was also an incident with regard to what's been referred to as a jump out.
>
> A:    Correct.
>
> Q:    And were you involved in the repercussions from that incident?
>
> A:    I certainly was.
>
> Q:    Would you explain what happened?
>
> A:    This was in the month of April, I believe. So it would've been two months or three months after the promotional process and I was on my

7

way to work and I received a call from a captain of another police department yelling, why aren't we investigating this –

MR. DURKIN [Mr. Frankenfield's counsel]:   Objection, Your Honor. Hearsay again.

MR. ASHLEY [Salisbury Township's counsel]:  It's not hearsay, Your Honor. It's an oral fact.

THE COURT:         Well, again, this is to simply show why the officer took certain action. The statement that was made is not evidence in this matter, and you should not consider it for its truth. On that basis, I will overrule the objection.

THE WITNESS:       I was on the phone with an irate ranking official from another police department asking why we were not investigating and actively working on a stabbing and shooting that occurred in Salisbury Township on my way into work. So I proceeded to call the on-duty corporal as well as the detective and find out what actually happened that evening.
       They looked at the reports. There was no report. And the other corporal stated, I was at roll call, which was at shift change to exchange information and nothing was said to me that anything happened in our township last night.

MR. DURKIN:        Objection, Your Honor. Again, this is hearsay.

THE COURT:         May I see counsel?
       (Sidebar begins at 3:31 p.m.)

THE COURT:         It's not hearsay depending on where you're going with this. Where you going with this?

MR. ASHLEY:        He's trying to explain that he had problems with him about doing the reporting. The impact of not having the report.

THE COURT:         Now why is that hearsay?

MR. DURKIN:        That part is fine. But he's now talking -- now he's introducing what other corporals are saying to him who aren't here testifying.

MR. ASHLEY:        Judge, he's explaining as part of the process, it should have been (indiscernible), the corporals. The corporals knew nothing about it. And therefore, that was one of the issues that they had to address.

8

THE COURT:  I think it shows how he got to a certain point with regard to the reports. Isn't that what he attested to?

MR. DURKIN:  Yeah. And this is also cumulative. This has already been gone over ad nauseum.

THE COURT:  I'm not worried about cumulative.

MR. DURKIN:  Ad nauseum.

THE COURT:  I want to hear you on the hearsay issue.

MR. DURKIN:  He can say that he investigated the situation and he found out that Budd didn't do a report.

THE COURT:  (Indiscernible) show a basis as to why he's –

MR. DURKIN:  Now they're introducing that he didn't tell the corporal, but they're not bringing in the corporal. They're putting it in as a hearsay statement through somebody else. Without that statement, there's no way that that jury has any information that he didn't pass this on at roll call.

MR. ASHLEY:  Well, he talked to the corporal and the corporal told him. He didn't get the information and that's –

THE COURT:  And then he went back and did what? Isn't that where you are with this –

MR. ASHLEY:  That's where I'm trying to get to, yeah.

THE COURT:  That's what I'm asking, where you going with it?

MR. ASHLEY:  Well, he's going to explain that he found out they went back, and they went to the Plaintiff and he indicated he had not done the report.

THE COURT:  That's not hearsay. And my question or the instruction should help with that. Overrule the objection.

(Sidebar ends at 3:33 p.m.)

THE COURT:  Ladies and gentlemen, I'm overruling the objection on hearsay. As I've instructed you before, the purpose of the out-of-court statements, the statements that would normally be hearsay, you may not

9

accept them for the truth of that fact. This is background as to what the sergeant did later on with regard to this information and it's only for that purpose.

It is not for you to decide whether those statements made to the sergeant were true. You may proceed with that question.

MR. ASHLEY:     Okay.

BY MR. ASHLEY:
Q:      Do you remember where you were?

A:      I checked to see if any reports were written. There were no reports. Nothing was said at shift change or roll call. And I proceeded down to the scene to try and investigate to see what happened.

Q:      Did you ultimately find out who the corporal was on duty when this incident took place?

A:      At the time, it was Corporal Frankenfield. Yes.

Q:      All right. And did you contact him with regard to why there was no report written?

A:      I did speak to him about that, yes.

Q:      And what did he say?

A:      There was no reason given.

Q:      He just didn't do it?

A:      I asked him to write the report as soon as possible and that I already took the number and wrote the report and he had to do a supplement to that.

Q:      Okay. And again, what was the importance of having the report done shortly after the incident took place?

A:      Well, several important facts. One, it was a stabbing with a shot fired at the person. Two, there was still a crime scene with blood evidence found at the scene. And no information was passed along to the shifts, either coming or going from the department at the time. And through investigation, it was found out that this isn't the first time this happened down at this location. And it's a safety issue for everyone involved.

>Q: The police would want to know that these incidents were happening in that area?
>
>A: That's correct.
>
>Q: All right. And again, when you discuss this issue with the Plaintiff, he didn't have any explanation about why he didn't write a report?
>
>A: He did not. And I asked him the right to supplement and that ended up being generated three days after I asked him to write a supplement A.S.A.P.
>
>Q: How long does it take to generate these types of reports?
>
>A: To take a number and generate a report, it takes literally seconds, but to actually do a full report, a couple of minutes.
>
>Q: All right. So he would have had to spend the time to – what information would have been in that report?
>
>A: Location, date, time, caller information, basic general information of what happened. And what I actually did was got Allentown's report and actually cut and pasted it into our report to get more information. That was to add to our report because I had nothing to go on.
>
>Q: Are you the Plaintiff's direct supervisor?
>
>A: At times I can be, yes.
>
>Q: And did you become aware -- did you have any conversations with him other about this incident, but other incidents that you discussed with them and counseled him on how to handle them?
>
>A: Yes.

N.T., 11/20/19, pp. 173-179.  Sergeant Sabo also testified that Plaintiff repeatedly tried to test liquid narcotics using a test meant for dry narcotics, but Sabo never witnessed Plaintiff performing these tests, therefore Plaintiff contends this testimony was hearsay. The testimony, objections and court rulings regarding narcotics testing is:

>Q: Okay. And did you observe any problems or deficiencies with the Plaintiffs performance of his obligations as a corporal?

A: I did, yes.

Q: And what were they and can you explain them to the jury?

A: Throughout the year, several cases were brought before me that ended up from -- into criminal investigations with deficiencies that we noticed on patrol. I think one of the first cases that I tried to counsel and help with was a workman's comp claim. That would have been shortly after promotion of the corporals. And also Frankenfield cut his hand while testing drugs that were subject to an arrest. In our testing process, you can only test powders with our drug test kits and this happened to be a liquid and liquids don't work in our drug test kits.

So I saw the workman's comp claim and obviously it caused concern that liquids were being tested in the powder test kits. So I spoke with Officer Frankenfield about that as well as everyone else in the department. We did a roll call training and also mention to everyone that we want to make sure we don't test the liquid form in a powdered kit.

Q: And you said -- did you say roll call?

A: At shift change we have what's called roll call where the corporals or the sergeants would relay information to the next shift coming on. Obviously, we work 24/7. So you have a platoon coming off, a platoon coming on, an exchange of information that's necessary to operate the police department in a safe and proper manner.

Q: It's an important procedure?

A: It much so is.

Q: All right. I'm sorry that I interrupted you. Can you go back then?

A: So I did a roll call training, went over the testing kits of how they should be used, how they can't be used, what's proper, what's improper, not only for a safety and workman's comp reason, but because that's not what the test kits do. And throughout the year, two other times and specific as Officer Frankenfield continued to test those test kits with the liquid form.

Q: So you had to explain that that test wouldn't work?

A: Correct. So I explained to him personally. We did a roll call training not to single him out and to all the officers, because obviously, first of all, we had a workman's comp claim, not necessarily from the liquid. It was it was a break of an ampule that punctured a finger, which had to be checked out at the hospital.

But also reviewed with everyone safety precautions and how to test the drugs in the liquid form. And ultimately, it comes to investigations and we test it with a different type of test kit.

Q: Did you have any concerns that he continued to perform the test improperly?

A: I did for the fact that his subordinates came to us and expressed concern that it was –

MR. DURKIN: Objection, Your Honor. Hearsay.

THE COURT: Sustained.

MR. ASHLEY: Judge, this is just –

THE COURT: Let me instruct the jury. The information that's being elicited is not for the truth of it. It's to show what the officer did or what the sergeant did next. On that basis, I'm going to allow it.

BY MR. ASHLEY:
Q: Go ahead.

A: I'm sorry. Can you repeat the question, please?

Q: You were explaining what the officers would come to you.

A: Yeah. Through knowledge, it was obtained from officers that are his subordinates that they observed Officer Frankenfield testing a liquid again in the powdered test kits.

MR. DURKIN: Objection again, Your Honor. Move to strike. This is a hearsay statement. This is not something this witness knows of his own knowledge.

THE COURT: I have overruled the objection, and I've given a cautionary instruction to the jury. That was simply to show why the officer had concerns. It's not for the truth of what those hearsay statements were. That's not being proven in this case. The objection is overruled on that basis.

BY MR. ASHLEY:
Q: And when somebody continues to perform an activity that you basically instructed them not to do, do you feel that that has an impact on their ability to be a supervisor within the police department?

13

> A:   It certainly does. It questions their ability to make decisions and their command presence within the police department of what their subordinates will think of decisions that are going to be made.

N.T., 11/20/19, pp. 170-73.  Sergeant Sabo also testified regarding a theft investigation at Lehigh Valley Hospital for which he was not present.  Mr. Frankenfield maintains that this testimony was hearsay.  The testimony, objection and ruling by the Court was:

> Q:   Were there any other issues with regard to his involvement with, let's call it criminal activity at the Lehigh Valley Hospital Center?
>
> A:   There was another case that I recall that was a theft of products from the hospital. And during this case, this caused an issue because we had a complaint from the hospital directly to myself about inaction of the police department.  And when I obtained the video and reviewed the video, it pointed back to one of the cases also Frankenfield had where no action was taking on an arrestable offense.
>
> Q:   When you say you saw the video, what was occurring?
>
> A:   It was a theft of product from the hospital during the wintertime, and it was also a motor vehicle code violation.
>
> Q:   And he didn't prosecute those offenses?
>
> A:   He made contact with the parties involved and let them go.  We obtained the video and subsequently an arrest was made.
>
> Q:   And what does that indicate? It doesn't sound like it's a very significant incident. Why would that impact his ability to be a corporal?
>
> Q:   Our department works with a lot of organizations and we have to have very good working relationships with a lot of businesses, especially a large hospital in our jurisdiction.  And by having complaints about officers or complaints about our department for not following through with workloads or –
>
> MR. DURKIN:   Objection, Your Honor. He's testifying as to what the hospital thinks. He hasn't been qualified –
>
> THE COURT:   Overruled.
>
> MR. DURKIN:   -- an expert in public policy.

14

THE COURT: Overruled. You may answer the question.

THE WITNESS: It affects our working relationships as a police department and our accountability that we have with these organizations in our community that we work with.

BY MR. ASHLEY:
Q: After you learned of these incidents, did you have any contact with the Plaintiff about them?

A: I did. On every incident I at least spoke to him verbally. And on several of those occasions, we had roll call training and also several memos went out as a whole, not to target any certain individual.

Q: All right. And when you had the contact with him, was it one on one sometimes?

A: It was.

Q: And did you counsel him at that time?

A: Counseled him, coached him. Whatever terminology you want to use. But brought the issue to light and attempted to correct the behavior.

Q: Was any discipline given for these types of incidents?

A: It was not.

Q: Why not?

A: We were cautioned by our civil service attorney that discipline is negotiable and grievable, and to make sure that we coach, mentor and try and change behavior. And if someone does not successfully meet the criteria of their probation, so be it.

Q: All right. Your idea by coaching him at all was to get him to meet the requirements so he could pass probation; is that correct?

A: Correct.

Q: Is that what the whole process was designed to do?

A: That's the entire process. Correct.

N.T., 11/20/19, pp. 181-84.  Mr. Frankenfield contends that the Court's instruction that the jury could not consider this testimony for the truth of the matter asserted was insufficient and Salisbury Township never used this testimony for any purpose other than to "smear" Mr. Frankenfield's performance as a Corporal.  Pl.'s Br., pp. 4-5.  Salisbury Township responds that

> [t]his was information that Sergeant Sabo received in the normal course of business and was a factor in his evaluations of Mr. Frankenfield's performance.  The purpose of this testimony was not to smear the Plaintiff but to continue to demonstrate that he failed to perform his functions and duties as a Corporal in a good manner that would reflect well on the Salisbury police department and that his failure to perform simple tasks, negatively impacted the department and reflected negatively on his performance which clearly demonstrated that he was not successfully complet[ing] his probation.

Resp., p. 5.

Federal Rule of Evidence 801(c)(2) defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, "offer[ed] in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). The cautionary instructions provided to the jury explained that Sergeant Sabo's testimony was not hearsay because it was "background as to what the sergeant did later on with regard to this information and it's only for that purpose," it was "simply to show why the officer had concerns" and "to simply show why the officer took certain action."  N.T., 11/20/19, pp. 172, 173, 174.

In *United States v. Sallins*, 993 F.2d 344 (3d Cir. 1993), the Third Circuit Court of Appeals cautioned that "[w]hile officers generally should be allowed to explain the context in which they act, the use of out-of-court statements to show background has been identified as an area of 'widespread abuse.' " *Id.* at 346 (quoting 2 McCormick on

Evidence § 249, at 104 (4th ed. 1992)).  The use of out-of-court statements to show the background of actions taken by Sergeant Sabo to counsel Mr. Frankenfield and to personally investigate the cited incidents was permissible in this case.  To the extent Sergeant Sabo was offering the statements made to him to explain his actions in following up on investigations of the gang "jump out" and theft at Lehigh Valley Hospital and to explain his concerns and his counseling of Mr. Frankenfield and all other officers regarding drug testing, those statements were not offered for their truth.  Rather, they were offered for to explain the statements' effect on Sergeant Sabo as the listener of the statements.  They were admissible for a non-hearsay purpose. L*arochelle v. Wilmac Corp.*, 769 F. App'x 57, 65 (3d Cir. 2019) (citing *United States v. Edwards*, 792 F.3d 355, 357 n.2 (3d Cir. 2015) (admitting third-party statements to show their effect on the listener)).  Thus, Mr. Frankenfield's Motion for a new trial based on the admission of improper, prejudicial hearsay evidence must be denied.

      An appropriate Order follows.